IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

STEFFAN CREWS,                    ) Civ. No. 14-00009 ACK-RLP
                                  )
          Plaintiff,              )
                                  )
     v.                           )
                                  )
THE PRUDENTIAL INSURANCE COMPANY  )
OF AMERICA; DOE DEFENDANTS 1-20,  )
                                  )
          Defendants.             )
                                  )
_____)
                                  )

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

          For the reasons discussed herein, the Court GRANTS

Defendant's Motion for Summary Judgment.

FACTUAL BACKGROUND[1/]

          This case involves a life insurance dispute. Defendant

Prudential Insurance Company of America ("Prudential") provides

life insurance to active duty members of the United States armed

forces. In 2002, Plaintiff Steffan Crews ("Plaintiff") was an

active duty servicemember, married to Crystal Crews ("Crystal"),

who was also an active duty servicemember. (Pl.'s Decl. ¶¶ 4-5.)

On December 22, 2002, Crystal was killed in an automobile

accident. (Id. ¶ 10.)

_____

          [1/] The facts as recited in this Order are for the purpose of
disposing of the current motion and are not to be construed as
findings of fact that the parties may rely on in future
proceedings.

Prudential has provided group life insurance coverage to members of the United States armed services, their families, and veterans for the Department of Veterans Affairs (the "VA") since 1965. (Compl. ¶ 10; 38 U.S.C. §1966.) This insurance is provided as part of a program consisting of three types of policies: Servicemembers' Group Life Insurance ("SGLI") for life insurance on servicemembers themselves; Family SGLI ("FSGLI") for life insurance on family of servicemembers; and Veterans' Group Life Insurance ("VGLI"), which is not at issue here. (Compl. ¶¶ 10-13; Def.'s CSF ¶ 2.) In 1999, the VA and Prudential agreed that lump sum payments of insurance proceeds under these policies would be made through retained asset accounts called Alliance Accounts. Prudential's Office of Servicemembers Group Life Insurance administered the Alliance Account program, which provided claimants with an interest-bearing Alliance Account to hold their benefits payments and allowed access to those funds by writing checks. (Def.'s CSF, McKoy Decl. ¶¶ 2-5.)

At the time of Crystal's death, by virtue of their status as active duty servicemembers, a $250,000 Servicemember Group Life Insurance Policy ("SGLI Policy") was held by Crystal on her own life, and a $100,000 Family Servicemember Group Life Insurance Policy ("FSGLI Policy") was held by Plaintiff on Crystal's life. (Def.'s CSF ¶¶ 102; Opp'n at 4 n.1; Pl.'s CSF.) At issue in the instant suit is the FSGLI Policy.

2

On December 23, 2003, Plaintiff submitted a claim for death benefits under the SGLI Policy. (Def.'s CSF, Ex. B at "Ex. 6" (PRUD00024); Id., Ex. A (Pl.'s Depo.) at 27-28.) On January 13, 2003, Plaintiff states that he participated in a "review" at the Casualty Assistance Office at Fort Hood, where it was explained to him that he may be entitled to a FSGLI benefit. (Pl.'s CSF, Pl.'s Decl. ¶ 20.) Plaintiff therefore submitted a separate claim for death benefits under his FSGLI Policy on January 13, 2003. (Id., Ex. B at "Ex. 5" (PRUD00013); Id., Ex. A (Pl.'s Depo.) at 28.)

Prudential thereafter set up an Alliance Account for Plaintiff and sent him an information packet about the account in the mail, along with a box of checks. (Compl. ¶ 21; Def.'s CSF, Ex. A (Pl.'s Depo.) at 29-30.) Plaintiff states that the letter accompanying the box of checks stated "how much money was in that account" and "how to take the money out." (Def.'s CSF, Ex. A (Pl.'s Depo.) at 30.) Plaintiff states that it was his understanding that the amount in the Alliance Account represented his wife's SGLI Policy benefit of $250,000. (Id. at 31.) He also stated in his deposition that, at the time, he did not know if he was entitled to benefits under his FSGLI Policy and did not believe that the Alliance Account contained any money from that policy. (Id. at 31-32.)

The Alliance Account records available show that

Prudential made an initial deposit into the Alliance Account on January 17, 2003, of $250,366.23, which included the $250,000.00 SGLI Policy death benefit plus accrued interest. (Def.'s CSF, Ex. B at PRUD00045; Pl.'s CSF, Ex. 1.) The records also show that Plaintiff wrote a check for $8,000 on January 22, 2003; Plaintiff states that he did in fact write this check and it was made out to a funeral home. (Def.'s CSF, Ex. B at PRUD00045; Ex. A (Pl.'s Depo.) at 34.) Thus, at the latest, Plaintiff received the information about the Alliance Account, as well as the box of checks associated with that account, before January 22, 2003. Given this timing, only the SGLI Policy death benefit (of $250,366.32) had been deposited into the account at the time Plaintiff first received notice of the account.

The Alliance Account records show that on January 22, 2003, Prudential made a second deposit into the Alliance Account of $100,047.64, which Prudential states included the $100,000.00 FSGLI Policy death benefit plus accrued interest minus premiums due on the policy. (Def.'s CSF, Ex. B at PRUD00045; Compl. ¶ 25, Ex. A.) Plaintiff asserts he never knew about the FSGLI deposit. Other than the initial informational package he received in the mail in January 2003, Plaintiff denies having ever receiving any other documentation from Prudential concerning his Alliance Account until 2013. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 38-39.) It is undisputed, however, that Plaintiff's mailing address at

the time was 1058 South Fort Hood Street, PMB 141, Killeen, Texas 76541. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 25; Pl.'s CSF, Pl.'s Decl. ¶¶ 20, 22.) Prudential sent a confirmation of the FSGLI Policy payment postmarked January 23, 2003 to that address. (Def.'s CSF, Ex. E; Compl., Ex. A.) It also sent confirmation of the payment to the Casualty Operations Division. (Def.'s CSF, McKoy Decl. ¶ 4; Ex. E.) Prudential has also introduced evidence that it was its routine practice to send monthly account statements to all Alliance Account holders. (Def.'s CSF, Ex. F at 1 ("Your opening balance is shown on the Certificate of Account Confirmation in this package. Also, you will receive a comprehensive statement each month showing your Alliance Account balance, interest earned, withdrawals, applicable interest rate, and any other account activity.").)

On January 31, 2003, Check Number 108 was written from the Alliance Account in the amount of $100,000. (Def.'s CSF, Ex. B at PRUD00045; McKoy Decl. ¶ 3; Compl. ¶ 23, Ex. A.) In the account statement the payee is identified only as "Alliance check." (Id.) Plaintiff asserts that he has no knowledge of this check and has never received the FSGLI Policy death benefit. (Compl. ¶ 26; Def.'s CSF, Ex. A (Pl.'s Depo.) at 34-35; Pl.'s CSF, Pl.'s Decl. ¶¶ 30-32 & Ex. 1.)

Alliance Account records show that, after Check Number 108 was cashed, the account balance as of January 31, 2003 was

$242,570.54. (Def.'s CSF, Ex. B at PRUD00044-45.) Plaintiff

admits to having written a series of checks that were paid out

from the Alliance Account in February of 2003. Specifically,

Plaintiff admits to writing six checks totaling exactly

$250,570.54.[2/] (Def.'s CSF, Ex. B at PRU00047; Ex. A (Pl.'s

Depo.) at 37-41; Pl.'s CSF, Pl.'s Decl. ¶¶ 25-27 & Ex. 1.).)

Thus, in February 2003, Plaintiff drew out of the Alliance

Account exactly the same amount that was shown on the January 31,

2003 statement. Nevertheless, Plaintiff claims he never received

the January 31, 2003 statement, or any subsequent update as to

his account balance. (Pl.'s CSF, Pl.'s Decl. ¶¶ 29, 33-34; Def.'s

CSF, Ex. A (Pl.'s Depo.) at 29-30, 37.) In his declaration in

support of his opposition to the instant Motion, Plaintiff states

that it was his intention to close the Alliance Account in

February of 2003 and that, to do so, he "followed [Prudential's]

instructions on how to close the account by getting the current

account balance and writing a check for that amount." (Pl.'s CSF,

Pl.'s Decl. ¶ 28.) In his earlier deposition testimony, however,

---

[2/] The checks are as follows: (1) Check Number 102 payable
to Steffan Crews in the amount of $100,000; (2) Check Number 103
payable to Steffan Crews in the amount of $10,000; (3) Check
Number 104 payable to Teresita Crews (Plaintiff's mother) in the
amount of $10,000; (4) Check Number 107 payable to Teresita Crews
in the amount of $2,419; (5) Check Number 109 payable to Billy
Madden (Plaintiff's father-in-law) in the amount of $15,000; and
(6) Check Number 111 payable to Steffan Crews in the amount of
$105,161.64. (Def.'s CSF, Ex. B at PRUD00047.) Plaintiff states
he tore up checks numbered 105, 106, and 110. (Pl.'s CSF, Pl.'s
Decl. ¶¶ 25, 27.)

Plaintiff stated that he had no means of ascertaining the account balance other than by manually subtracting the checks he wrote against the opening account balance set forth in the January 2003 letter he received from Prudential. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 38-39.) Plaintiff states that he disposed of the Alliance Account documentation and the remaining checks. (Id. at 46.)

Plaintiff deployed to Iraq in March 2003. (Pl.'s CSF, Pl.'s Decl. ¶ 18.) Apparently there was no further communication between Plaintiff and Prudential about Plaintiff's FSGLI Policy claim until around February of 2013. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 47-48.) In February 2013, Plaintiff attended Casualty Assistance Officers training. (Id. ¶ 35.) Plaintiff states that, during the training, he learned that he qualified for FSGLI benefits that he asserts he never received. (Id. ¶ 36.) Plaintiff states that he raised this issue with his instructor, who "checked Army records" and stated that those records did not show any payment made for FSGLI benefits. (Id. ¶ 37.) Thereafter, Plaintiff contacted Prudential and inquired about the FSGLI Policy benefit. (Id. ¶ 38; Def.'s CSF, Ex. A (Pl.'s Depo.) at 41-43, 47-48.)

Plaintiff states that it was not until February 2013, when Prudential provided him with copies of his Alliance Account monthly account statements in response to his inquiry about the

FSGLI Policy, that he found out about the FSGLI deposit and Check Number 108. (Pl.'s CSF, Pl.'s Decl. ¶ 39; Def.'s CSF, Ex. A (Pl.'s Depo.) at 37.) Prudential states that it undertook multiple searches for additional records related to Plaintiff's Alliance Account, including searches for copies or scanned images of Check Number 108. (Def.'s CSF, Wetstein Decl. ¶¶ 2-3, 5.) Prudential located some documents, including the account statements for the account from January and February 2003, and the January 22, 2003 payment notification showing payment of the $100,047.64 FSGLI Policy benefit.[3] Prudential was unable, however, to locate any documentation regarding Check Number 108. (Id. ¶¶ 5-7.) Prudential notified Plaintiff via an April 24, 2013 letter that a copy of the check was unavailable because Plaintiff's request was made more than ten years after the date of the check. (Def.'s CSF, Ex. B, "Ex. 9.".) Pursuant to Prudential's document retention policies, Alliance Account documents are retained for their current year, plus eight years. Thus, a check written in 2003 would be retained until the end of 2003 plus eight years, or until the end of 2011. (Def.'s CSF, Wetsein Decl. ¶ 7.)

Unsatisfied with Prudential's production of records,

---

[3] Prudential states that these records had been retained by virtue of the fact that they were covered by a Records Hold Order in an unrelated class action suit in Massachusetts. (Mot. at 8-9.)

and asserting that he never received the FSGLI Policy benefit, Plaintiff filed the instant suit.

## PROCEDURAL BACKGROUND

On March 4, 2014, Plaintiff filed a Verified Complaint against Prudential in the Circuit Court of the First Circuit, State of Hawaii. (Doc. No. 1, Ex. A.) Prudential timely removed the action to this Court on April 21, 2014 pursuant to 28 U.S.C. §§ 1331, 1332(a), 1441(a), and 1446. (Doc. No. 1.) In his Complaint, Plaintiff asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, "breach of the standard of care in failing to provide material necessary to file policy claim," and unfair and deceptive acts in violation of Hawaii's Unfair and Deceptive Acts and Practices Act. Plaintiff seeks "actual, trebel, and punitive damages." (Compl. at 22.)

Prudential filed the instant Motion for Summary Judgment, along with a concise statement of facts and supporting exhibits, on January 7, 2015. (Doc. Nos. 28 & 29.) Plaintiff filed his memorandum in opposition, supported by a concise statement of facts and a declaration by Plaintiff, on March 18, 2015. (Doc. No. 44.) Prudential filed its reply on March 30, 2015. (Doc. No. 45.) A hearing on the motion was held on April 13, 2015.

**STANDARD**

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251–52 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. <u>Id.</u> at 587.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . . or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that

there is some metaphysical doubt as to the material facts."
Matsushita, 475 U.S. at 585. "[T]he requirement is that there be
no genuine issue of material fact . . . . Only disputes over
facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary
judgment." Anderson, 477 U.S. at 247-48 (emphasis in original).
Also, "[t]he mere existence of a scintilla of evidence in support
of the non-moving party's position is not sufficient[]" to defeat
summary judgment. Triton Energy Corp. v. Square D Co., 68 F.3d
1216, 1221 (9th Cir. 1995). Likewise, the nonmoving party "cannot
defeat summary judgment with allegations in the complaint, or
with unsupported conjecture or conclusory statements." Hernandez
v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003).

## DISCUSSION

In the instant motion, Prudential seeks dismissal of
Plaintiff's Complaint in its entirety on the basis that
Plaintiff's claims are barred by laches.[4/]

_____

[4/] Plaintiff concedes that laches is an available defense
to his claims and is not barred by the Servicemembers' Civil
Relief Act ("SCRA"), 50 U.S.C. § 501, *et seq.* (Opp'n at 5, 17.)
Generally, the SCRA tolls all statutes of limitations applicable
to claims brought by full-time, active duty servicemembers. 50
App. U.S.C. § 526(a). As Prudential asserts, and Plaintiff
concedes, however, the SCRA does not prevent laches from barring
a servicemember's claims, as laches is a limitation on stale
claims entirely independent of any applicable statutes of
limitations. See Ass'n of Apartment Owners of Newtown Meadows ex
rel. its Bd. of Directors v. Venture 15, Inc., 167 P.3d 225, 284
(Haw. 2007); Mot. at 23-24; Opp'n at 17.

11

"The doctrine of laches reflects the equitable maxim that equity aids the vigilant, not those who slumber on their rights." <u>Ass'n of Apartment Owners of Newton Meadows v. Venture 15, Inc.</u>, 167 P.3d 225, 284 (Haw. 2007) (quoting <u>Adair v. Hustace</u>, 640 P.2d 294, 300 (Haw. 1982)). In order for the doctrine to apply, two components must be present:

> First, there must have been a delay by the plaintiff in bringing his claim . . . and that delay must have been unreasonable under the circumstances. Delay is reasonable if the claim was brought without undue delay after plaintiff knew of the wrong or knew of facts and circumstances sufficient to impute such knowledge to him. Second, that delay must have resulted in prejudice to defendant. Common but by no means exclusive examples of such prejudice are loss of evidence with which to contest plaintiff's claims, including the fading memories or deaths of material witnesses, changes in the value of the subject matter, changes in defendant's position, and intervening rights of third parties.

<u>Id.</u> (quoting <u>Adair</u>, 640 P.2d at 321). The Court addresses each component in turn.

## A. Unreasonable Delay

First, to raise the defense of laches, Prudential must demonstrate that there was an unreasonable delay in bringing the subject claim. "Lapse of time alone does not constitute laches. Since laches is an equitable defense, its application is controlled by equitable considerations." <u>Pelosi v. Wailea Ranch Estates</u>, 985 P.2d 1045, 1058 (Haw. 1999) (quoting <u>Yokochi v. Yoshimoto</u>, 353 P.2d 820, 823 (Haw. 1960)). "Delay is reasonable

if the claim was brought without undue delay after plaintiff knew of the wrong or knew of facts and circumstances sufficient to impute such knowledge to him." Id. (quoting Adair, 640 P.2d at 300).

Here, Prudential argues that Plaintiff unreasonably delayed in bringing this action because he did not contact Prudential to inquire about his FSGLI Policy claim until February 2013, ten years after he filed the claim on January 13, 2003 and first knew, or should have known, of his claim in the instant suit.

It is undisputed that on January 13, 2003, Plaintiff was informed by the Casualty Assistance Office at Fort Hood that he may be entitled to a FSGLI benefit, and that he filed a claim under his FSGLI Policy on that date. (Pl.'s CSF, Pl.'s Decl. ¶ 20; Def.'s CSF, Ex. A (Pl.'s Depo.) at 26-28; Ex. B at PRUD00013.) Thus, as of January 13, 2003, Plaintiff had knowledge of his outstanding FSGLI Policy claim. It is also undisputed that Plaintiff never contacted Prudential at any time after January 13, 2003 (until 2013) to inquire about the status of his FSGLI Policy claim. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 42.)

Plaintiff offers no explanation for this delay, other than by stating that, at the time, he was uncertain about whether he was even entitled to benefits under the FSGLI Policy. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 26-28.) He does not, however, dispute

that he did, in fact, file a FSGLI claim for benefits. (Id. at 26-28.) Moreover, he also admitted that there is typically some uncertainty at the time a claim is filed as to how an insurance company will respond. (Id. at 48-49.) Even if Plaintiff assumed his FSGLI claim had been denied, or was unsure as to whether he was entitled to benefits under the FSGLI Policy, it is undisputed that he was fully aware that he had filed a claim under that policy in January 2003, and he offers no reason whatsoever for the ten-year delay in inquiring about the processing of the claim, or disputing its resolution.

In short, there is no dispute of material fact that Plaintiff knew or should have known as of January 13, 2003 about the existence of his FSGLI claim, but failed to inquire about it for ten years. The Court is satisfied this ten-year period during which Plaintiff did nothing to follow-up on his FSGLI claim constitutes undue delay. See, e.g., Evergreen Safety Council v. RSA Network Inc., 697 F.3d 1221, 1227 (9th Cir. 2012) (finding a ten year delay from the date on which a party knew or should have known of an alleged copyright infringement was sufficient to support a laches defense).

Moreover, even assuming Plaintiff's failure to inquire about his outstanding FSGLI claim for over ten years doesn't in and of itself constitute an unreasonable delay, the Court also finds that Plaintiff knew or should have known about the January

2003 FSGLI payment at the time it was made. Plaintiff does not dispute that Prudential deposited the $100,047.64 FSGLI payment into his Alliance Account on January 22, 2003. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 35.) Plaintiff nevertheless asserts that he had no way of knowing that his FSGLI claim had been paid because he never received any statements or additional information from Prudential after the initial January 2003 mailing informing him of the Alliance Account and sending him checks. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 29-30; Pl.'s CSF, Pl.'s Decl. ¶¶ 29-30.) Plaintiff further asserts that he never wrote or knew about Check Number 108, written for $100,000 and debited from the Alliance Account on January 31, 2003. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 35-36.)

The Court finds, however, that no reasonable juror could conclude that, under the circumstances presented here, Plaintiff was unaware of the fact that the $100,047.64 FSGLI payment was deposited into his Alliance Account, and that Check Number 108 for $100,000 was drawn on the account. First, the Prudential records that are available show that an Alliance Payment Notification regarding the FSGLI payment was mailed to Plaintiff at the address that he has confirmed was his mailing address at the time, and where he received the initial mailing from Prudential regarding the establishment of the Alliance Account. (See Def.'s CSF, McKoy Decl. & Ex. E; Ex. A (Pl.'s

Depo.) at 25, 29-30.) This was the same address listed on the copies of the account statements for January 2003 and February 2003. (Def.'s CSF, Ex. B at PRUD00044-47.)

Further, notwithstanding his claims to the contrary, Plaintiff's documented withdrawals from the Alliance Account suggest that he was aware of the actual account balance at the time. Plaintiff admits to having withdrawn a total of $250,570.54 from the Alliance Account; however, the initial deposit into the account (the only amount Plaintiff claims to have ever been aware of by virtue of the first mailing) was only $250,366.23. (<u>See id.</u>; Def.'s CSF, Ex. A (Pl.'s Depo.) at 31 (testifying that the initial letter about the Alliance Account stated how much money was in the account as of the initial deposit).) In his deposition testimony, Plaintiff stated that he received no account statements and had no way of ascertaining his Alliance Account balance other than by manually calculating his current balance based on the starting balance and the checks he had already written. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 30, 38-39.) The fact that Plaintiff drew out more from the account than was initially deposited (prior to the $100,047.64 FSGLI payment) indicates, however, that he knew or should have known at the time he was writing checks to draw down on the account that the account had more money in it than could be accounted for solely by the initial SGLI benefit deposit.

16

Indeed, in his declaration in opposition to the instant motion, Plaintiff now asserts (in apparent contradiction to his prior sworn testimony) that he found out the account balance for the purpose of closing the account by "getting the current balance and writing a check for that amount." (Pl.'s CSF, Pl.'s Decl. ¶ 28.) Plaintiff's opposition states that he obtained the account balance by using "a telephonic automatic balance apparatus." (Opp'n at 10-11.) Moreover, Plaintiff states in his opposition that the initial mailing from Prudential about the Alliance Account (which Plaintiff does not dispute he received) included a toll-free number to be used to acquire "account balance information." (Opp'n at 9.) Thus, as of early January of 2003, Plaintiff had the ability to (and did) ascertain the balance of the Alliance Account, and would have been aware that there had been a deposit subsequent to the initial SGLI benefit deposit.

In sum, there is no dispute that, as of January 2003, Plaintiff knew that he had filed a claim under the FSGLI Policy, knew that an Alliance Account had been set up for him by Prudential, knew how to access the balance of this account (and in fact did so), and yet took no action for over ten years to determine the FSGLI claim's status or inquire about the additional deposit into his account.

Plaintiff has offered no reason, let alone factual

allegations sufficient to raise a question of fact, as to why he failed to inquire about his FSGLI claim or the claimed Alliance Account discrepancies for ten years. (<u>See generally</u> Pl.'s CSF.) Thus, even if, as Plaintiff claims, he lacked actual knowledge of his entitlement to FSGLI benefits or the circumstances of the additional deposit into his Alliance Account, the Court concludes that, at the very least, the undisputed facts and circumstances were sufficient to impute knowledge of the alleged harm to him. <u>See</u> <u>Adair</u>, 640 P.2d 302-303 (finding laches appropriate where the record contained "facts and circumstances from which a jury could properly impute knowledge of the claim [such that the parties'] failure to act sooner was unreasonable"); <u>Brown v. Bishop Trust Co.</u>, 355 P.2d 179, 185 (Haw. 1960) (granting summary judgment against plaintiffs even though they claimed they did not have actual knowledge of the alleged harm because "there were enough facts staring them in the face to put them on inquiry")); <u>see also</u> <u>Order of R.R. Telegraphers v. Railway Express Agency</u>, 321 U.S. 342, 348-39 (1944) (stating that the doctrine of laches is "designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared"); <u>Evergreen Safety Council</u>, 697 F.3d at 1227 (finding a ten-year delay unreasonable "because it involved no evaluation or investigation of the claim, or other legitimate

justification; [the plaintiff] merely slept on its rights.").

## B. Prejudice

Having found that Plaintiff unreasonably delayed in bringing his claims in the instant suit, the Court turns next to an assessment of whether the delay resulted in prejudice to Prudential. "A lengthy delay, even if unexcused, that does not result in prejudice does not support a laches defense." Grand Canyon Trust v. Tucson Elec. Power Co., 391 F.3d 979, 988 (9th Cir. 2004).

Prudential asserts that there has been substantial evidentiary prejudice to it as a result of Plaintiff's unreasonable delay. Specifically, Prudential states that it has disposed of key documents in the ordinary course of business during the ten years between the transactions at issue and the time Plaintiff first contacted Prudential in 2013. Upon receiving Plaintiff's inquiry in 2013, Prudential undertook a search of its records for any documentary proof of the FSGLI payment. (Def.'s CSF, Wetstein Decl. ¶¶ 3-5, 8 & Ex. C.) Prudential found copies of the January and February 2003 account statements, as well as the payment notification and explanation of benefits associated with the FSGLI benefit payment; however, it was unable to find any additional documentation regarding Check Number 108 or the Alliance Account because of its document retention policy and the time elapsed since the FSGLI claim was made and processed. (Id.,

Wetstein Decl. ¶¶ 5-8.)

Specifically, Prudential states that, pursuant to its document retention policies, Alliance Account documents are retained for their current year, plus eight years. Thus, checks written in 2003 were retained until the end of 2011. (<u>Id.</u>, Wetstein Decl. ¶ 7.) Because of this, any documentation regarding Check Number 108 was disposed of in the normal course of business at the end of 2011. Thus, despite conducting several diligent searches, Prudential has been unable to retrieve any additional documentation regarding Plaintiff's account and the checks drawn therefrom.

Without the absent records, however, Prudential is unable to adequately defend itself against Plaintiff's assertions that he did not write Check Number 108 and never received the FSGLI Policy benefit. Because these facts lie at the crux of Plaintiff's claims, Prudential is clearly prejudiced by the evidentiary gaps produced by the intervening delay of ten years. Indeed, this is precisely the kind of prejudice that Hawaii courts have recognized as a basis for laches, which bars relief where "during inexcusable delay, the evidence has become obscured and, under the circumstances of the case, it is too late to ascertain the merits of the controversy." <u>Poka v. Holi</u>, 357 P.2d 100, 107 (Haw. 1960); <u>see also</u> <u>Adair</u>, 640 P.2d at 321 (listing "loss of evidence" as an example of prejudice arising out of

undue delay); Evergreen Safety Council, 697 F.3d at 1227

("Evidentiary prejudice includes such things as lost, stale, or

degraded evidence . . ..."); Danjaq LLC v. Sony Corp., 263 F.3d

942, 956 (9th Cir. 2001) (stating that the prejudice inquiry asks

"not whether *some* [evidence] might be available - it is whether

the absence of *other* [evidence] ([that] will be absent because of

[the plaintiff's] delay) will prejudice [the moving party]")

(emphasis in original).

Plaintiff's opposition, while hardly a model of

clarity, appears to attempt to argue that, because Plaintiff was

an active-duty servicemember, Prudential should have retained the

relevant documents longer. (Opp'n at 17-18.) Plaintiff does not

make any specific factual assertions, however, as to why his

status as an active-duty servicemember prevented him from making

any inquiry regarding the FSGLI benefits for ten years. Plaintiff

states that he was deployed to Iraq in 2003; however, he does not

(and can not credibly) assert that he was deployed for the entire

ten-year period. Moreover, Plaintiff himself admits that, during

the intervening ten years, he himself disposed of all of the

relevant documentation in his possession, including the letter

confirming the opening of the Alliance Account and payment of the

SGLI benefits, and the remaining checks associated with the

account. (Def.'s CSF, Ex. A (Pl.'s Depo.) at 46.) Thus, Plaintiff

- through his inexcusable delay and his own disposal of

documentation – clearly contributed to the evidentiary prejudice Prudential now faces.

In sum, the Court concludes that there is no question of material fact that there was an unreasonable delay in Plaintiff bringing his claim regarding the FSGLI Policy benefit, and that that unreasonable delay caused prejudice to Prudential with respect to its ability to defend the instant suit. As such, the Court concludes that the doctrine of laches bars the instant suit. The Court therefore GRANTS Prudential's Motion for Summary Judgment and dismisses Plaintiff's Complaint in its entirety.[5/] Further, the Court concludes that, because the Court finds that laches applies to bar Plaintiffs' claims, any amendment of the Complaint would be futile. <u>See, e.g.,</u> <u>Bonin v. Calderon</u>, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").

---

[5/] Because the Court concludes that laches bars all of the claims in Plaintiff's Complaint, the Court need not address Prudential's alternative argument that Plaintiff's third claim, for negligence, fails because Prudential had no duty to retain documents indefinitely.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment. Plaintiff's Verified Complaint is DISMISSED WITH PREJUDICE in its entirety.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 13, 2015



_____
Alan C. Kay
Senior United States District Judge

Crews v. Prudential, Civ. No. 14-00009 ACK RLP, Order Granting Defendant's Motion for Summary Judgment.